IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK V. W., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 C 1297 |
| | ) | |
| ANDREW M. SAUL, | ) | Magistrate Judge Finnegan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Patrick V. W. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court now grants the Commissioner's motion.

## BACKGROUND

Plaintiff applied for DIB on August 26, 2015, alleging disability since October 14, 2014 due to "left side rotator problems." (R. 180, 203). Born in March 1953, Plaintiff was 61 years old as of the alleged disability onset date. (R. 180). He has a high school diploma and worked for approximately 26 years as a semi-truck driver, performing at a very heavy exertional level. (R. 34, 204). On October 14, 2014, Plaintiff injured his left (dominant) shoulder while pushing a pallet up a trailer at work. (R. 37, 332). He had

arthroscopic surgery to repair a left rotator cuff tear, followed by physical therapy and work conditioning/hardening. (R. 352, 383-84).[1] By June 2015, Plaintiff was released to work at a medium exertional level, but the trucking company was not able to accommodate this lower level. (R. 358-62, 408). Plaintiff retired and has not worked since the October 14, 2014 injury date. (R. 37-38, 46, 176).

The Social Security Administration denied Plaintiff's application initially on August 11, 2015, and again upon reconsideration on October 22, 2015. (R. 65-79). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Deborah M. Giesen (the "ALJ") on December 20, 2017. (R. 31). The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Kathleen M. Doehla (the "VE"). (R. 32-54). On March 22, 2018, the ALJ found that Plaintiff's degenerative disc disease of the cervical spine, degenerative disc disease of the thoracic spine, and left cubital tunnel syndrome are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16-17). After reviewing the medical and testimonial evidence in detail, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform medium work with: no climbing ladders, ropes, or scaffolds; no overhead reaching; no more than frequent handling (gripping and grasping) with the left dominant hand; and no limitation with the right hand. (R. 17-23). Relying on the VE's testimony that a person with Plaintiff's background and RFC could perform Plaintiff's past work as a semi-truck driver as it is generally performed at a medium level, the ALJ found that Plaintiff was not disabled at any time prior to the

---

[1] Plaintiff had previously injured his right shoulder when he slipped from a tractor-trailer while at work on December 19, 2008. He underwent a right rotator cuff repair on February 13, 2009. (R. 354).

2

date of the decision. (R. 23-24). The Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of his request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in failing to award him a closed period of benefits from October 14, 2014 to March 2016; (2) failed to properly evaluate the functional requirements of his past relevant work driving a semi-truck; and (3) erred in discounting his statements regarding the limiting effects of his symptoms. For reasons discussed in this opinion, the Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any

4

work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.     Analysis**

    **1.     Closed Period of Disability**

Plaintiff argues that the case must be reversed or remanded because the ALJ should have awarded him a closed period of benefits from October 14, 2014 to March 2016. (Doc. 13, at 5). This argument is largely based not on the medical or testimonial evidence of record, but on certain language the ALJ used in her decision. In discussing Plaintiff's severe impairments at Step 2 of the analysis, the ALJ stated that he "made notable improvements in range of motion, strength, and posture" after the left rotator cuff surgery, physical therapy, and work conditioning/hardening. (R. 16). According to the ALJ, by March 2016, Plaintiff's "active range of motion in his shoulders were within functional limits bilaterally without pain and [he had] full muscle strength in his bilateral upper extremities." (*Id.*). Later in the decision, the ALJ reiterated that Plaintiff was "discharged from physical therapy during April of 2016, at which time [he] had the ability to resume overhead lifting without increased pain." (R. 19). Plaintiff claims that these statements reflect the ALJ's determination that he was "seemingly disabled" prior to March 2016, at which point he "returned to functional work levels." (Doc. 13, at 5). In Plaintiff's view, by using the term "improvement" in describing his functioning as of April 2016, the ALJ signaled that his functioning "leading up to this improvement would have

5

therefore been at a lesser capacity," which translates into an award of a closed period of benefits. (Doc. 25, at 2). The Court disagrees.

Contrary to Plaintiff's assertion, nothing in the ALJ's decision suggests that she believed Plaintiff's condition was disabling at any time. Read in context, the cited language about improvement is simply part of a detailed description of the medical evidence and Plaintiff's course of treatment. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."). This view of the ALJ's decision is bolstered by the medical evidence itself, which reasonably supports the ALJ's conclusion that Plaintiff retains an RFC for medium work and was never under a disability.

As noted, Plaintiff injured his left shoulder at work on October 14, 2014. An October 17, 2014 MRI confirmed a rotator cuff tear, and orthopedic surgeon Henry J. Fuentes, M.D., repaired it arthroscopically on November 7, 2014. (R. 16, 380, 381). Plaintiff attended physical therapy ("PT") from November 12, 2014 to March 2, 2015, at which point he had progressed well and Dr. Fuentes transitioned him to the more strenuous work conditioning/hardening ("WCH") program. (R. 16, 19, 344, 346, 348, 350, 352, 399). When Plaintiff started WCH, he had the functional ability to do light work. (R. 377). By April 20, 2015, his functional ability had improved to medium work, and he maintained that level through completion of the WCH program on June 10, 2015. (R. 16, 365-71, 452). On that date, John Connell ATC, a certified athletic trainer, completed a Functional Capacity Evaluation ("FCE") of Plaintiff confirming his ability to perform medium work, including occasionally lifting 67.8 pounds from desk to chair; occasionally lifting 60.6 pounds from chair to floor; and occasionally lifting 34.6 pounds above the

6

shoulder. (R. 16, 358). Plaintiff could also sit, stand, and walk for 8 hours in an 8-hour workday; frequently lift 23.6 pounds above his shoulders; frequently balance, bend, stoop, climb stairs, crawl, crouch, kneel, squat, and grasp with his hand; push and pull 106.3 pounds; and carry 47 pounds with his left arm and 42 pounds with his right arm. (R. 359, 361). Dr. Fuentes released Plaintiff to work on June 15, 2015 with permanent restriction to medium work as set forth in the FCE. (R. 407). Plaintiff applied for disability benefits soon thereafter on August 26, 2015.

Plaintiff did not seek further treatment for his shoulder after June 15, 2015, but nearly 8 months later on February 5, 2016, he went to see orthopedic surgeon Chintan S. Sampat, M.D., with complaints of neck pain radiating into his left arm at a level of 8/10. (R. 19, 602). The pain had started three days earlier on February 2, though Plaintiff had not suffered a specific trauma or injury. (*Id.*). Plaintiff told Dr. Sampat that the pain was worse when he turned his neck to the left and he had a difficult time when trying to sleep. On exam, Plaintiff could flex 70 degrees in the cervical spine and touch his chin to his chest. He could also extend his neck 20 degrees and demonstrated bilateral rotation and bending to 45 degrees. Plaintiff did not have any tenderness over the cervical spine; no pain with range of motion in either shoulder; no evidence of impingement; and full grip and motor strength. Though he had normal sensation in both hands, there was diminished sensation in his left medial arm and ulnar forearm compared to the right. (R. 19, 603). X-rays of the cervical spine showed severe spondylotic disease of the cervical spine with loss of cervical lordosis. Dr. Sampat prescribed a Medrol Dosepak for pain and recommended Plaintiff get an MRI of the cervical spine. (*Id.*).

7

The February 12, 2016 MRI showed a large central to left-sided disc protrusion at the T1-T2 level with cephalad extension. This was causing central canal, left lateral recess, and left foraminal stenosis. There were also degenerative changes of the cervical spine at other levels, with central canal and foraminal stenosis most severe at C3-C4 and C4-C5. (R. 19, 607). At a follow-up appointment on February 29, 2016, Dr. Sampat confirmed that Plaintiff had normal gait, excellent strength in both arms and legs from C5-T1 and L2-S1, and excellent hand strength. (R. 608). The only problem was Plaintiff's neck, but even that was "not nearly as bad as it used to be." (*Id.*). Dr. Sampat prescribed a "gentle course of physical therapy with traction modalities." (R. 19, 608). Plaintiff began PT on March 1, 2016 with decreased strength, range of motion and sensation in the cervical spine. (R. 19, 600-01). A few weeks later, on March 25, 2016, Plaintiff told Dr. Sampat he was "doing much better." On exam, he demonstrated normal strength of 5/5, full cervical range of motion without pain, and an ability to perform rapid repetitive activities without difficulty despite some numbness in his elbow. (R. 20, 611). Plaintiff was discharged from PT on April 7, 2016, at which time he was once again performing at his prior level of functioning. (R. 19, 662).

Plaintiff returned to Dr. Sampat on June 24, 2016 complaining of pain and some tingling in his left arm. He reported occasionally dropping coffee cups and said his handwriting was worse than it used to be. Plaintiff's exam was largely normal so Dr. Sampat sent him for MRIs of both the cervical and thoracic spine. (R. 20, 613). The July 1, 2016 MRI of the cervical spine showed very small improvement from the prior February 12, 2016 MRI. (R. 617-18). The MRI of the thoracic spine showed spondylotic changes but no disc herniation or extrusion, foraminal narrowing, or central stenosis at any level.

8

(R. 619). On July 7, 2016, Plaintiff returned to Dr. Fuentes for assistance in obtaining disability benefits. For the first time since June 2015, he complained of persistent pain and weakness in his shoulders. (R. 621). The next day, on July 8, 2016, Plaintiff told Dr. Sampat that he continued to experience some numbness in the elbow, but on exam he had full motor strength of 5/5, normal sensation from C5-T1 and L2-S1, and an ability to perform rapid repetitive activities without difficulty. Dr. Sampat recommended an EMG of the upper arms due to a positive Tinel sign over the left cubital tunnel. (R. 20, 625).

The July 22, 2016 EMG was consistent with left-sided C8-T1 radiculopathy, and showed an overall mild left carpal tunnel syndrome and cubital tunnel syndrome. (R. 20, 641-42). Dr. Sampat recommended conservative, nonsurgical treatment. (R. 20, 629). On August 25, 2016, Dr. Fuentes examined Plaintiff and concurred with Dr. Sampat's non-surgical approach since the hand numbness and tingling did not result in any weakness and "does not bother [Plaintiff] that much." (R. 20, 631). Thereafter, Plaintiff only saw his family practice doctor for routine care and did not complain of further problems with his shoulders, hands, neck, elbow, or back. Exams during that time were routinely normal with full range of motion, full strength, and normal sensation. (R. 20, 666, 670-71, 676-77, 681, 689-90, 693-94).

Plaintiff does not mention most of this evidence or explain how it supports his claim for a closed period of disability. Instead, he focuses on a few select records which he discusses in isolation without proper context. For example, Plaintiff directs the Court to PT notes from February and March 2015 showing he exhibited functional limitations in carrying, climbing ladders, lifting from the floor, lifting overhead, and performing sustained or repetitive activities. (Doc. 13, at 6; R. 344, 409). As noted, however, Plaintiff entered

9

the WCH program on March 2, 2015 with an ability to work at a light level, and by April 20, 2015 he had progressed to a medium level of work involving lifting and carrying 60 pounds. (R. 371, 377). He maintained that medium functional ability through June 15, 2015 when he was discharged from the WCH program, and he did not complain of shoulder problems again until more than a year later on July 7, 2016 when he saw Dr. Fuentes for help securing disability benefits. (R. 365, 452, 621). Plaintiff fails to explain how a few PT records from February and March 2015 cancel out all the other records consistently showing he was able to work.

For similar reasons, there is no merit to Plaintiff's suggestion that his February 2016 cervical MRI supports his claim of disability. (Doc. 13, at 6). Though the test did show left-sided disc protrusion, stenosis, and degenerative changes, Plaintiff routinely exhibited full motor strength of 5/5, normal sensation from C5-T1 and L2-S1, and an ability to perform rapid repetitive activities without difficulty. (R. 608, 611, 625). Plaintiff is correct that a March 1, 2016 PT note documented decreased strength, range of motion, and functional ability in the cervical spine (R. 600-01), but when Plaintiff completed PT the following month on April 7, 2016, he had achieved his prior level of functioning. (R. 662). Plaintiff says nothing about this evidence.

Plaintiff finally stresses that in February 2015, Dr. Fuentes reported his "Work Status" as "temporarily totally disabled" with a 20 pound lifting restriction. (Doc. 13, at 6; R. 344-45). According to Plaintiff, "[s]uch a weight limitation would result in a finding of disability per the Medical-Vocational Guidelines." (Doc. 13, at 6). In making this argument, Plaintiff ignores the fact that the ALJ assigned little weight to Dr. Fuentes's opinion because it was inconsistent with his own treatment notes showing an ability to

10

work at a medium demand level just 6 months after the October 14, 2014 rotator cuff injury. (R. 21, 407). *See Migdalia M. v. Saul*, 414 F. Supp. 3d 1126, 1133 (N.D. Ill. 2019) ("[I]n order to get benefits a claimant must be 'disabled' for a continuous period of not less than twelve months."). The ALJ instead gave great weight to the opinions from State agency reviewers Vidya Madala, M.D., and Bernard Stevens, M.D., who found Plaintiff capable of medium work in reports dated October 30, 2015 and May 6, 2016 respectively. (R. 21, 59-60, 71-72). These findings are consistent with Dr. Fuentes's treatment note releasing Plaintiff to medium duty work as of June 15, 2015. (R. 407). Plaintiff does not challenge the weight given to any of these opinions or articulate how they show that he is entitled to a closed period of disability benefits. Nor does Plaintiff address the ALJ's observation that Dr. Fuentes's terminology regarding temporary total disability "does not correspond to the Social Security Regulations." (R. 21).

Viewing the record as a whole, there is no support for Plaintiff's assertion that the ALJ either did or should have found him disabled for a closed period from October 14, 2014 to March 2016. Plaintiff's request to reverse or remand the case for further consideration of this issue is denied.

### 2. Plaintiff's Past Relevant Work

Plaintiff next argues that the ALJ committed reversible error in finding him capable of performing his past relevant work. To determine whether a claimant is "capable of returning to her former work, the ALJ must ascertain the demands of that work in relation to the claimant's present physical capacities." *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984). This requires the ALJ "to make specific findings of fact as to the claimant's RFC, the physical and mental demands of the claimant's past job, and,

11

whether, given the claimant's RFC, she could return to her past work." *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *18 (N.D. Ill. Sept. 16, 2009) (internal citation omitted). *See also* SSR 82-62, 1982 WL 31386 (1982) ("Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work.").

Plaintiff argues that the ALJ failed to make the requisite findings because she did not consider whether he is able to perform each specific job function associated with the medium level semi-truck driving position. (Doc. 13, at 7-8; Doc. 25, at 3-4). As Plaintiff explains, the ALJ "failed to evaluate how much sitting, climbing, gripping or turning of the steering wheel, or turning of the head might be required," and instead "equated Plaintiff's past work to medium work and found him able to perform his past job." (Doc. 13, at 7; Doc. 25, at 4). Plaintiff says this is inadequate because "all medium exertional level jobs are not identical and an individual may be capable of one job at the medium exertional level but not another." (Doc. 13, at 7).

The cases Plaintiff relies on to support this argument are readily distinguishable. In *Nolen v. Sullivan*, 939 F.2d 516 (7th Cir. 1991), and *Prince v. Sullivan*, 933 F.2d 598 (7th Cir. 1991), the court rejected the ALJ's Step 4 finding because the ALJ described the plaintiff's previous jobs generally based on their exertional level alone. *Nolen*, 939 F.2d at 519 ("unskilled at the light exertional level"); *Prince*, 933 F.2d at 603 ("heavy"). *See also Strocchia*, 2009 WL 2992549, at *19 ("light unskilled work"). Here, conversely, the VE characterized Plaintiff's past relevant work as a "semi-truck driver" with a Dictionary of Occupational Titles ("DOT") code of 904.383-010, and explained it was "[p]erformed at

12

an SVP of 4, making it semi-skilled and performed at the medium physical demand level per the DOT but very heavy as actually performed." (R. 51). The ALJ accepted the VE's testimony and stated that "[i]n comparing [Plaintiff's] residual functional capacity with the physical and mental demands of this [semi-truck driving] work, the undersigned finds that [Plaintiff] is able to perform it as generally performed." (R. 23). This demonstrates the ALJ considered Plaintiff's specific job and the way he performed it. For purposes of Step 4, "the ALJ was not required to provide a more detailed description of [Plaintiff's] past work nor was [s]he required to further elaborate on h[is] alleged limitations in performing the job." *Robertson v. Berryhill*, No. 17 C 4034, 2018 WL 11088455, at *6 (N.D. Ill. Aug. 24, 2018). *See also Cohen v. Astrue*, 258 F. App'x 20, 28 (7th Cir. 2007) (finding *Nolen* inapplicable where the ALJ considered the specific jobs the plaintiff held).

In another case Plaintiff cites, *Smith v. Barnhart*, 388 F.3d 251 (7th Cir. 2004), the court considered an ALJ's determination that since the plaintiff had an RFC for sedentary work, and her past relevant work was sedentary in nature, she could perform her past relevant work. *Id.* at 252. The court held that it was improper for the ALJ to equate the plaintiff's past relevant work to sedentary work in general. The ALJ "should have considered not whether [the plaintiff] could perform some type of sedentary work but whether she could perform the duties of the specific jobs that she had held." *Id.* The court noted that the plaintiff's past jobs all required a lot of typing and writing, and the ALJ failed to explain why the plaintiff could perform these tasks despite having arthritis in both hands. *Id.*

The ALJ in this case did not simply equate Plaintiff's ability to perform medium work in general with an ability to work as a semi-truck driver in particular based on the

13

job's classification at a medium level. Instead, the ALJ relied on the opinion of a VE to assess whether Plaintiff could perform the requirements of his past relevant work, and accepted the VE's testimony that he could. (R. 23). Plaintiff says that, per the DOT, the semi-truck driver job requires an ability to maneuver and inspect the vehicle. He then speculates as to specific tasks these terms may encompass: maneuvering the vehicle "would likely require extensive reaching and pulling on the steering wheel, extensive turning of the neck to scan the road for traffic and checking of side-view mirrors, and long periods of sitting in a likely vibrating and jostling truck cab"; and inspecting the vehicle "would likely require climbing up a ladder into the trailer or climbing a ladder to the top of the trailer." (Doc. 13, at 8). Plaintiff also notes he would need to climb into the cab to drive the truck. (*Id.*). According to Plaintiff, the ALJ needed to explain how he is able to perform each of these activities despite having degenerative disc disease of the thoracic spine, range of motion deficits in the cervical spine, and pain in his back, neck, arms, and shoulders. (*Id.* at 8-9; Doc. 25, at 4).

The flaw in this argument is that Plaintiff does not deny that the medical evidence of record supports the ALJ's RFC finding, which involves medium exertional work with: no climbing ladders, ropes, or scaffolds; no overhead reaching; and no more than frequent handling (gripping and grasping) with the left dominant hand. (R. 17). *Compare Prince*, 933 F.2d at 603 (where the ALJ failed to make any findings regarding the plaintiff's RFC, the court had "no indication of whether [the plaintiff] could in fact meet the exertional requirements of [his past] job."). Plaintiff points to no physician of record who opined that he has additional functional limitations that would impact his ability to maneuver or inspect a semi-truck, climb into the cab, or perform any other aspect of the job. To the extent

14

Plaintiff believes the ALJ should have included more restrictions based on his subjective statements regarding problems with his neck, back, shoulders, and arms, the ALJ reasonably discounted those allegations for reasons discussed in further detail below. Absent evidence that the ALJ omitted proven functional limitations from the RFC, the ALJ was not required to do a function-by-function assessment of his actual limitations under SSR 96-8p. *See Zatz v. Astrue*, 346 F. App'x 107, 111 (7th Cir. 2009) ("A function-by-function assessment of an individual's limitations ensures that the ALJ does not overlook an important restriction . . . But an ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence.").

In sum, the ALJ's decision to accept the VE's testimony that Plaintiff can perform his past relevant work as a semi-truck driver as the work is generally performed is supported by substantial evidence. The case will not be remanded for further consideration of this issue.

### 3. Plaintiff's Testimony

Plaintiff finally argues that the case must be reversed or remanded because the ALJ failed to properly weigh his statements regarding the limiting effects of his impairments. The regulations describe a two-step process for evaluating a claimant's own description of his impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2. If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id*. In evaluating a claimant's

symptoms, "an ALJ must consider several factors, including the claimant's daily activities, h[is] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). An ALJ's assessment of a claimant's subjective complaints will be reversed only if "patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Plaintiff testified that he found the WCH program for his left shoulder painful and needed to take Aleve afterwards. (R. 43). He runs out of steam when doing repetitive tasks around the house and has to stop and rest after about 10 minutes. The pain is not constant but is "more frequent than infrequent." (R. 43-44). In February 2016, Plaintiff discussed the possibility of a cervical fusion with Dr. Sampat but is fearful of having the procedure. (R. 41-43). He has struggled with numbness in his left elbow since March 2016 which makes it difficult to write and grasp objects. (R. 41-42). The left shoulder pain causes Plaintiff to have trouble sleeping for more than two hours and he frequently sleeps in a recliner. (R. 44-45). Plaintiff testified that he can sit for about 20 minutes before needing to stand up, and can comfortably lift only 8 to 10 pounds. (R. 46-47). He does not take any prescription pain medications. (R. 47).

In discounting Plaintiff's statements of pain, the ALJ first noted that they were inconsistent with the objective medical record. (R. 19). Though MRIs of the cervical and thoracic spine showed spondylotic changes, cervicalgia, and cervical radiculopathy, Plaintiff responded well to a "gentle course of physical therapy with traction modalities." (R. 19, 607-08, 662). At exams on February 29 and March 23, 2016, Plaintiff had full range of motion in the cervical spine without pain; excellent arm and hand strength of 5/5 despite some elbow numbness; normal sensation from C5-T1; and full ability to perform

rapid, repetitive activities without difficulty. (R. 19, 608, 611). Upon discharge from PT in April 2016, Plaintiff was able to resume overhead lifting without increased pain and said his symptoms had improved 70% overall. (R. 19, 662). Nothing in these records supports Plaintiff's assertion that he suffers from disabling neck limitations, or that he has any related functional restrictions that impact his ability to lift and carry up to 50 pounds as required for the medium level semi-truck driving job. *Thorps v. Astrue*, 873 F. Supp. 2d 995, 1006 (N.D. Ill. 2012) (citing *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[A] patient's subjective complaints are not required to be accepted insofar as they clashed with other, objective medical evidence in the record.").

With respect to Plaintiff's left elbow, he complained in June 2016 that it was chronically numb with occasional pain that radiated down his hand, and an EMG study showed mild left cubital tunnel and carpal tunnel syndrome. (R. 20, 613, 641-42). Yet Plaintiff had no hand weakness, good range of motion, and decent clinical grip strength. (R. 20, 631). And since the numbness and tingling "does not bother him that much," Plaintiff's doctors recommended no further intervention after August 2016. (R. 20, 629, 631). In fact, Plaintiff did not receive further treatment related to his shoulders, neck, elbow, back, arms, or hands, from August 2016 through May 2017 (the date of the last available record), and during that time he routinely denied to his primary care physician that he had any weakness or other issues with those areas. (R. 20, 666, 670-71, 690, 676-77). *See Craft*, 539 F.3d at 679 (infrequent treatment can support an adverse credibility finding). Plaintiff does not address this medical evidence or explain how it supports his claims of disabling symptoms.

17

Plaintiff finally objects that the ALJ erred in rejecting his statements regarding the intensity and frequency of his symptoms based on the fact that he received only conservative treatment. (Doc. 13, at 11-12). Plaintiff notes that Dr. Sampat advised against surgical intervention for his neck condition (R. 608), which he says explains his decision to pursue only non-surgical options. (Doc. 13, at 11) (citing *Thomas v. Colvin*, No. 13 C 3686, 2015 WL 515240, at *4 (N.D. Ill. Feb. 6, 2015)) ("A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist."). Of course, Dr. Sampat also contemplated the possibility that "the majority of [Plaintiff's] symptoms [could] go away" on their own. (R. 629). In that regard, the medical evidence showed that Plaintiff had good range of motion, excellent strength, normal sensory and motor function, and was not really bothered by the numbness and tingling in his left arm. (R. 20, 629, 631). *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (receipt of conservative treatment is a legitimate reason to find a claimant not entirely credible). Moreover, the only medication Plaintiff took for pain was over-the-counter Aleve. (R. 21). *See, e.g., Pratt v. Colvin*, No. 12 C 8983, 2014 WL 1612857, at *11 (N.D. Ill. Apr. 16, 2014) ("The lack of prescription medication is inconsistent with a finding of disabling pain.").

An ALJ's credibility assessment "need not be perfect; it just can't be patently wrong." *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)). And "[a]s the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek*

18

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). Viewing the record as a whole, the ALJ provided several valid reasons for discounting Plaintiff's complaints of disabling symptoms, and that decision is supported by substantial evidence.

## **CONCLUSION**

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is denied, and the Commissioner's motion for summary judgment [20] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: December 15, 2020

_____
SHEILA FINNEGAN
United States Magistrate Judge

19